# Exhibit 4

NG.FER.CU.09 | 30/04/2024

| | |
|---|---|
| **CODE:** NG.FER.CU.09 | **TITLE:** Competition Policy |
| **VERSION:** 2 | **SCOPE:** General |
| **DATE OF FIRST PUBLICATION:** 18/12/2024 | **CANCELS:** SG-07 Competition Policy |
| **PUBLICATION DATE OF THE CURRENT VERSION:** 30/04/2024 | **ORIGINAL VERSION LANGUAGE:** Spanish |
| **APPROVED BY:** Chief Executive Officer | **ISSUING AREA:** Compliance and Risk Department |

_____

### Review history

| Edition | Date of Publication | Summary and reasons for change | Cancels/Replaces: |
|---|---|---|---|
| 1 | 18/12/2014 | First version SG-07 Competition Policy | N/A |
| 2 | 30/04/2024 | Policy review and update | SG-07 Competition Policy |

### INDEX

1. Introduction ........................................................................................................................... 2
2. Purpose .................................................................................................................................. 2
3. Definitions ............................................................................................................................. 3
4. Scope of application ............................................................................................................. 3
5. Purpose and general description of the competition regulations ................................... 3
6. Description of prohibited conduct ...................................................................................... 4
   6.1 Collusive behaviour ........................................................................................................ 4
      6.1.1 Horizontal anti-competitive agreements ............................................................... 4
      6.1.2 Exchanges of commercially sensitive information between competing companies ........... 5
      6.1.3 Vertical anti-competitive agreements .................................................................... 5
   6.2 Abuse of dominant position .......................................................................................... 6
   6.3 Unfair conduct which distorts competition ................................................................. 6
   6.4 The execution of merger operations without prior authorisation ............................. 6
7. Risks arising from infringements of competition regulations ......................................... 6
8. Knowledge of infringements of competition regulations ................................................. 7

**ferrovial**

## 1. Introduction

This Competition Policy (hereinafter, "the Policy") is part of the corporate governance policies of Ferrovial SE and its Group and is based on Ferrovial's firm commitment to strict compliance with applicable laws and regulations.

Ferrovial's values as reflected in the Code of Ethics and Business Conduct ("Code of Ethics") imply a commitment to the highest standards of integrity, transparency, respect for the law and human rights. Ferrovial therefore demands its business to be conducted in accordance with these principles and with the utmost respect for applicable national and international laws.

Ferrovial has approved organisational and management procedures that include control and supervision measures to prevent irregular actions in the organisation, and to enable Ferrovial's directors and employees to act in accordance with the law in the performance of their duties.

## 2. Purpose

Ferrovial is committed to promoting competitive processes in the market so that companies can compete freely and with equal opportunities, allowing the market to make decisions independently and without restrictions. Our business and professional activities are based on fair competition with our competitors, the aim of which is to offer our customers the best possible conditions.

The Policy establishes a guide to behaviour for all Employees and members of the governing bodies of Ferrovial Group companies, aimed at ensuring compliance with competition legislation.

Although the Policy takes the competition regulations applicable in Spain, the rest of the European Union and the United States of America as its main reference, the principles and recommendations are intended to be universally applicable and must be taken into account in any part of the world in which Ferrovial operates.

This Policy provides a brief overview of the key principles of competition law applicable in most countries. It is not exhaustive and should be read and interpreted in accordance with the applicable law in each jurisdiction, with guidance from the relevant legal department if necessary. This Policy shall apply unless there is a speciality in the local regulations to which any of the companies or Employees of the Ferrovial Group are subject that prevents the application of all or part of this Policy or is more restrictive.

Ferrovial employees will be provided *with a Competition Compliance Guide,* which provides practical details on the different precautions to be taken into account to avoid anti-competitive behaviour.

Many of the competition regulations contain a concept of extraterritorial application. Activities conducted entirely in one country or jurisdiction may nevertheless be subject to the laws for the defence of competition of another country or jurisdiction if they have a direct, substantial and reasonably foreseeable effect on the internal or external trade of that country or jurisdiction. Thus, in certain cases, conduct may have to be assessed under both US and EU competition laws, for example, as a complement to the law of the country in which it takes place. Always consult the relevant legal counsel if necessary.



3.   Definitions

**Ethics Channel:** A channel for communication with Ferrovial by which Employees, directors and interested Third Parties can make queries, complaints and reports.

**Customer:** A natural or legal person, outside Ferrovial, for whom Ferrovial undertakes works or provides services in exchange for consideration.

**Employees:** The employees and managers of Ferrovial.

**Ferrovial or Group:** Ferrovial SE and the consolidated group of companies headed by that company, and all the entities that it controls, directly or indirectly. "Control" is understood to exist when Ferrovial holds a majority of the voting rights within the management or governing body.

**Supplier:** A natural or legal person, at arm's length from Ferrovial, supplying products and materials or providing works or services (with its own or subcontracted personnel) to Ferrovial.

**Partner:** Any natural or legal person with which Ferrovial intends to enter into an agreement to maintain a business relationship of any kind in the form of a grouping, consortium, joint venture, association, foundation or company of any kind.

**Third party:** A person who is not an Employee or director of Ferrovial or another Group company, such as Partners, Suppliers, contractors or subcontractors.

4.   Scope of application

This Policy shall apply to the following individuals and entities within the scope of their activity:

> Ferrovial SE and the companies that comprise the Ferrovial Group, whatever their area of business, geographical location or activities;
> Members of the governing bodies of Ferrovial SE and the members of the governing bodies of the companies that comprise the Group (including *supervisory boards* or equivalent bodies);
> Directors and Employees of any of the companies that comprise the Group.

5.   Purpose and general description of the competition regulations

The competition regulations aim to guarantee free competition between companies in the market, in the belief that a competitive market benefits customers/consumers (in terms of better prices and greater variety and quality of products and services).

Competition rules in the countries where Ferrovial operates are reasonably similar. These rules are based on widely accepted economic and legal principles and, at the regulatory level, can be condensed into the following four prohibitions:

  i.   prohibition of **collusive behaviour,**
  ii.  prohibition of **abuse of dominant position,**
  iii. prohibition of **unfair conduct that distorts competition,** and



NG.FER.CU.09 30/04/2024

    iv.    prohibition on the execution **of mergers without prior authorisation**.

In cases where an infringement of competition rules is found to have occurred, the offending company could face up to:

- The imposition of civil and, in some countries, criminal sanctions.
- The publication of the sanction and the consequent reputational damage.
- Claims for damages for infringement of competition law.
- Prohibition of contracting with public administrations.

## 6. Description of prohibited conduct

Ferrovial is committed to an effective prevention of the infringement of competition regulations. This prevention requires a minimum understanding of the content of the four types of anti-competitive practices mentioned above, each of which has its own characteristics and variants. The following is a description of the conduct prohibited under competition law.

### 6.1 Collusive behaviour

In general, collusive or anti-competitive conduct can be classified as follows:

    a. horizontal anti-competitive agreements,
    b. exchanges of commercially sensitive information between competing companies, and
    c. vertical anti-competitive agreements.

#### 6.1.1 Horizontal anti-competitive agreements

The competition regulations consider any understanding of wills between companies to be an 'agreement'. This includes not only written contracts, but also 'gentlemen's agreements', verbal agreements and even situations where consent is implied.

Agreements between competing companies are called 'horizontal agreements' or cartels. In general, this type of agreement presents a very significant risk of competition regulations infringement. Participation in a cartel can lead to severe penalties, including, in some countries such as the US, imprisonment for the employees involved.

In general, competition rules consider horizontal agreements involving price fixing, fixing of trading conditions, establishment of production or sales quotas, market sharing, coordination of commercial strategies, non-competition or non-solicitation clauses, or boycotts of other companies as anti-competitive and prohibit them without exception.

Extreme caution should be exercised in relation to horizontal agreements in the framework of public procurement procedures, given the importance of contracts with public administrations for Ferrovial's activity.

Finally, there are other types of horizontal agreements that may be anti-competitive, but which are compatible with competition law under certain circumstances, such as joint R&D agreements, *joint*



4

*venture* or subcontracting agreements, agreements for the creation of industry standards, or joint purchasing agreements (such as the creation of a purchasing pool). Such agreements should be subject to the supervision of the relevant legal counsel.

### 6.1.2 Exchanges of commercially sensitive information between competing companies

Exchanges of commercially sensitive information between competing companies are prohibited under competition regulations, since this type of behaviour reduces the business uncertainty of those exchanging information, even when the company derives no benefit from the exchange of information.

Commercially sensitive information is generally considered to be information of a secret nature that relates to the strategic behaviour of a company in the present or in the future. Conversely, information that is of a historical nature, aggregated (where it relates to several companies, without allowing differentiation by company, or to a group of different products or markets), or public, i.e. available through freely accessible sources, will not normally be commercially sensitive.

Exchanges of commercially sensitive information between competing companies can take place in a number of contexts:

   i.   directly between companies, through oral or written communications,
   ii.  directly or indirectly within sectoral business associations or in other business forums, or
   iii. indirectly through suppliers or joint customers of the companies.

Meetings of professional organisations can be forums for legitimate discussion on issues of legal, safety, public policy, etc. However, it is important to remember that they are meetings with competitors, and therefore all precautions regarding the content and intent of discussions at these meetings must be respected in order to comply with competition law at all times.

Similarly, it should also be recalled that in many markets, mergers, acquisitions and joint ventures are subject to strict regulation by competition authorities.

### 6.1.3 Vertical anti-competitive agreements

'Vertical agreements' are agreements between companies in a customer-supplier relationship.

Vertical agreements are likely to infringe competition regulations. The treatment of this type of agreement in the regulations of the different countries in which the Group operates is also more variable than that of other types of behaviours.

In any event, as a general rule almost without exception, all vertical agreements in which the supplier restricts the commercial freedom of its customer are to be regarded as prohibited.

There are other types of vertical agreements which normally only present risks where one of the parties has high market shares or where the duration of the agreements is long. These agreements are often materialised through contractual clauses, which require monitoring by legal counsel.



6.2    Abuse of dominant position

'Dominant position' is the position of economic power that enables a company to prevent effective competition in the market. The characteristic feature of dominance is the ability of the dominant company to behave independently with regards to its competitors, customers or suppliers.

The existence of a dominant position is not prohibited by the competition law. What is prohibited is for the dominant company to abuse its dominant position.

In essence, abusive practices are considered to be those aimed at (i) driving competitors out of the market, or (ii) exploiting or discriminating against Customers.

6.3    Unfair conduct which distorts competition

The competition laws in some countries prohibit unfair business conduct that, because of the circumstances in which such conduct occurs, has the potential to negatively impact competition in the market.

Care must be taken to avoid engaging in unfair conduct which is normally associated with a higher risk of adversely affecting competition and thus infringing competition law.

6.4    The implementation of merger operations without prior authorisation

A '**merger operation**' is an operation whereby a company obtains control over business assets hitherto controlled by a third party. The most obvious example of a merger operation is the purchase and sale of a company, but the creation of a *joint venture*, a long-term industrial lease or the subrogation in a long-term service contract can also be a merger.

The execution of such operations may require the authorisation of one or more competition authorities, depending on whether or not the companies or assets affected by the operation exceed certain turnover, market share or value thresholds.

In most of the countries in which Ferrovial operates, competition regulations require prior authorisation.

Consequently, in the context of any corporate operation, the advice of legal counsel should always be borne in mind in relation to the possibility of the operation being a merger operation subject to prior clearance. It should also be borne in mind that any documentation related to the operation may have to be submitted to the competition authorities concerned.

7.    Risks arising from infringements of competition regulations

Infringements on competition could entail significant risks for Ferrovial and also for the employees and directors who may be involved in them.

These risks vary depending on the regulations applicable in each country, but generally include the following:



large fines, which in Spain and the European Union can amount to 10% of the Group's annual turnover,

prohibition on contracting with the public sector,

claims for compensation for damage caused to third parties by the unlawful conduct,

in some countries, criminal liability for employees, managers and directors involved in the illegal conduct,

disqualification from the exercise of their profession or from holding managerial or administrative positions for the natural persons involved in the unlawful conduct,

reputational damage (as a consequence of the public nature of administrative and judicial investigations and decisions concerning competition regulations infringements), and

civil nullity of contracts contrary to the competition regulations.

8. Knowledge of infringements of competition regulations

In the event that a Ferrovial employee becomes aware of any type of infringement of competition regulations, they must inform their superior, the Compliance and Risk Department or report this infringement via Ferrovial's Ethics Channel. Ferrovial's Ethics Channel allows for anonymous reporting (to the extent feasible and permitted by applicable law) and guarantees that the whistleblower will be protected against any attempt at retaliation.

